TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN








NO. 03-04-00599-CV






Dymra Henderson, Appellant


v.


William C. Chambers; Frank Brown, Esq.; Armbrust, Brown & Davis, LLP;

Strasburger & Price and Timothy S. Chambers, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT

NO. GN103183, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING





O P I N I O N



 Dymra Henderson appeals a summary judgment granted in favor of her ex-husband,
Timothy Chambers, her ex-husband's father, William C. Chambers, and their attorneys, Frank
Brown, Ambrust & Brown, LLP, and Strasburger & Price, LLP (collectively, "Defendant
Attorneys"). (1)
 Henderson alleged that Timothy Chambers, William Chambers, and the Defendant
Attorneys conspired to defraud Henderson out of her community property interest in property that
was subject to a June 1998 agreed divorce decree. We conclude that this lawsuit is an impermissible
collateral attack on the divorce decree and affirm the summary judgment.

 Henderson and Timothy Chambers were married September 5, 1987. On April 6,
1993, Timothy Chambers and William Chambers created the BC Partnership to develop a piece of
real property known as Moore's Crossing. In 1995, Timothy Chambers and William Chambers hired
Defendant Attorneys to draft an "Amended and Restated Partnership Agreement" for the BC
Partnership. The relevant difference between the original partnership agreement and the amended
agreement is that the amended agreement recited that Timothy Chambers owned his interest in BC
Partnership "as his sole and separate property." At the same time the amended agreement was
drafted and signed, Defendant Attorneys prepared a gift letter reciting a gift of $13,000 to Timothy
Chambers from his parents, William and Rosalie Chambers. Both the amended partnership
agreement and the gift letter were backdated to April 6, 1993, the original date of the BC
Partnership's formation.

 Henderson filed for divorce from Timothy Chambers on October 20, 1997. Among
her allegations in the 1997 divorce action were claims that Timothy Chambers had attempted to
defraud Henderson out of her share of community property by fraudulently recharacterizing
community property as his separate property. More specifically, Henderson claimed that Timothy
Chambers conspired with his parents to defraud her of her interest in Moore's Crossing and
fraudulently manipulated documents relating to the BC Partnership to accomplish the
recharacterization. Consequently, these allegations were in controversy as part of the divorce dispute
in 1997-98. 

 Henderson and Timothy Chambers settled their property dispute in April 1998 and
signed a Memorandum of Understanding that gave whatever interests either party had in the BC
Partnership and the related entities having to do with Moore's Crossing to Timothy Chambers. This
settlement was later memorialized in the agreed final divorce decree entered by the district court on
June 29, 1998, which awarded Timothy Chambers "[a]ny and all business interest that either party
may have in any of the following companies, partnerships, or other entities: Valeo, Moore's
Crossing, B.C. Partnership, S.R. Development, and W.G.T.C." (2) 

 Henderson filed this lawsuit on September 28, 2001, against William Chambers and
Defendant Attorneys alleging that they defrauded Henderson of her community interest in the assets
awarded to Timothy Chambers in the 1998 divorce decree relating to the BC Partnership/Moore's
Crossing. Specifically, she pointed to the 1995 gift letter and amendments to the BC Partnership
agreement claiming that they fraudulently recharacterized community assets as Timothy Chambers's
separate property. 

 The defendants filed their original motion for summary judgment March 4, 2004. 
Henderson amended her petition and added Timothy Chambers as a defendant April 5, 2004. 
Henderson alleged the following causes of action in her amended petition: (1) fraud and conspiracy,
(2) knowing participation in breach of fiduciary duty, (3) conspiracy, (4) negligent misrepresentation,
(5) breach of the duty of good faith and fair dealing, and (6) statutory fraud. She asserted separate,
individual claims against Timothy Chambers for breach of fiduciary duty and against the Defendant
Attorneys for negligence. On April 6, 2004, Henderson also filed a separate lawsuit in the form of
an Original Petition for Bill of Review directly attacking the 1998 divorce decree as having been
procured by fraud on the part of the same defendants. This bill of review action is a separate cause
in the trial court and is not before us in this appeal. The defendants filed an amended motion for
summary judgment on April 8, 2004, addressing the new allegations made in Henderson's amended
petition. The defendants sought summary judgment on several grounds, including that Henderson's
2001 lawsuit constituted an impermissible collateral attack on the 1998 divorce decree. On August
20, 2004, the trial court granted summary judgment in favor of all of the defendants without
designating a particular basis for the ruling.


Standard of Review

 We review the summary judgment de novo. Joe v. Two Thirty Nine Joint Venture, 145
S.W.3d 150, 156 (Tex. 2004). To prevail on a motion for summary judgment, the movant must show
that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. See
Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 217 (Tex. 2004) (citing Tex. R. Civ.
P. 166a(c)). When reviewing a summary judgment, we take as true all evidence favorable to the
nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's
favor. Two Thirty Nine Joint Venture, 145 S.W.3d at 157 (citing Southwestern Elec. Power Co. v.
Grant, 73 S.W.3d 211, 215 (Tex. 2002)). Because the district court's order granting summary
judgment does not specify the basis for the ruling, we will affirm the summary judgment if any of the
theories presented to the trial court and preserved for appellate review is meritorious. See Knott, 128
S.W.3d at 217. 


Collateral Attack

 The defendants argue that this lawsuit is, as a matter of law, an impermissible
collateral attack on the 1998 divorce decree. Collateral attacks on final judgments are generally
disallowed because it is the policy of the law to give finality to the judgments of the courts. Tice v.
City of Pasadena, 767 S.W.2d 700, 703 (Tex. 1989) (quoting Crouch v. McGaw, 138 S.W.2d 94, 96
(Tex. 1940)). A collateral attack, unlike a direct attack, does not attempt to secure the rendition of
a single, correct judgment in place of the former judgment. Ramsey v. Ramsey, 19 S.W.3d 548, 552
(Tex. App.--Austin 2000, no pet.). Rather, it is an attempt to avoid the effect of a judgment in a
proceeding not instituted for the purpose of correcting, modifying, or vacating the judgment, but in
order to obtain some specific relief which the judgment currently stands as a bar against. See id., see
also Biaza v. Simon, 879 S.W.2d 349, 353 (Tex. App.--Houston [14th Dist.] 1994, writ denied). 
Only a void judgment may be collaterally attacked. Browning v. Placke, 698 S.W.2d 362, 363 (Tex.
1985). A judgment is void only when it is apparent that the court rendering judgment "had no
jurisdiction of the parties or property, no jurisdiction of the subject matter, no jurisdiction to enter the
particular judgment, or no capacity to act." Id. (citing Austin Indep. Sch. Dist. v. Sierra Club, 495
S.W.2d 878, 881 (Tex. 1973)). Henderson does not argue in this case that the 1998 divorce decree
is void. Therefore, if her allegations in this lawsuit are a collateral attack on the divorce decree, such
an attack is improper. 

 We believe this case is controlled by the Texas Supreme Court's opinion in Browning
v. Prostok, 165 S.W.3d 336, 346 (Tex. 2005). In Prostok, junior bondholders sued the former
officers, directors, and financial advisors of National Gypsum Company in Texas state court for fraud
and constructive fraud, breach of fiduciary duty, and civil conspiracy alleging that the defendants
fraudulently undervalued National Gypsum during bankruptcy proceedings. See id. at 341. The
alleged purpose of the fraud was to reduce the value of the company in bankruptcy so that
distributions to junior bondholders as part of the plan of reorganization would be lower and the
interests acquired by senior bondholders in the company emerging from bankruptcy would ultimately
be higher. See id. at 342. The problem with the state court lawsuit was that the issues relating to the
alleged fraudulent activity on the part of the officers and directors had been litigated as a part of the
chapter 11 plan confirmation proceedings in the bankruptcy court. See id. at 349. The bankruptcy
court considered these claims--brought by a committee of bond and trade unsecured creditors
appointed by the trustee (3)--and expressly found that the committee did not meet its burden on the
issue. Id. The bankruptcy court ultimately entered an order confirming the plan of reorganization in
March 1993, effectively denying the relief sought by the bond and trade unsecured creditors
committee on the fraud claims. Id.

 In October 1995, Jeff Prostok, on behalf of himself and the other junior bondholders,
filed a state court lawsuit against the former officers and directors of National Gypsum Company
alleging breach of fiduciary duty, fraud, constructive fraud, and civil conspiracy in connection with
the valuation of the company in the bankruptcy proceeding. See id. at 341. The factual basis of the
fraud claims in the state court lawsuit was the same as for the claims that had been made in the
bankruptcy court in the course of challenging the plan of reorganization. The Prostok defendants
moved for summary judgment on the basis that the state court claims were barred because they were
a collateral attack on the bankruptcy court's order confirming the plan of reorganization. See id. at
343. The Prostok plaintiffs argued that the state court claims were based on extrinsic fraud by the
defendants as opposed to intrinsic fraud, and therefore, the claims were not an impermissible
collateral attack on the bankruptcy court order. The supreme court has recognized that when a party
does not seek to set aside a prior judgment, but instead brings suit based on extrinsic fraud, the action
is not a collateral attack. See id. at 347 (citing State v. Durham, 860 S.W.2d 63, 67 (Tex. 1993)). 
Thus, the central issue in Prostok was whether the state court fraud claims were intrinsic or extrinsic
to the bankruptcy court confirmation order. The supreme court held that the claims filed by the junior
bondholders in the subsequent state court lawsuit were intrinsic to the bankruptcy court's
confirmation order and, therefore, constituted an impermissible collateral attack on the prior order. 
Id. at 349. 

 In this case, Henderson relies on the same theory as the Prostok plaintiffs--that,
although her claims are related to matters that were at issue in the previous divorce case, her claims
are extrinsic to the 1998 divorce decree and, thus, do not constitute a collateral attack on the decree. 
Consequently, the resolution of whether Henderson's claims are an impermissible collateral attack
on the 1998 divorce decree turns on whether her claims in this case are extrinsic or intrinsic to the
decree. 

 In Prostok, the supreme court examined the distinction between claims of intrinsic and
extrinsic fraud and laid out the framework for distinguishing between the two. See id. at 347-48. 
Extrinsic fraud is fraud that denies a losing party the opportunity to fully litigate at trial all the rights
or defenses that could have been asserted. Id. at 347 (citing Montgomery v. Kennedy, 669 S.W.2d
309, 312 (Tex. 1984)). It generally includes wrongful conduct occurring outside of the adversarial
proceedings and must be collateral to the matter tried and not something that was actually or
potentially in issue. Id. Intrinsic fraud, by contrast, "relates to the merits of the issues [that] were
presented and presumably were or should have been settled in the former action." See id. at 347-348
(quoting Tice, 767 S.W.2d at 702). Intrinsic fraud includes fraudulent instruments, perjured
testimony, or any matter which was actually presented to and considered by the trial court in rendering
judgment. Id. at 348. More importantly for this case, the supreme court noted that "when the
fraudulent acts themselves are in issue, or could have been in issue, in the prior proceeding, the fraud
is intrinsic." Id. The court elaborated on this point:


This Court has noted that while concealment of a material fact by a fiduciary charged
with the duty of full disclosure generally is extrinsic fraud, where "the alleged
specific fraudulent acts were known and in issue in the prior suit, the fraud is
intrinsic."


. . . . 


[A]n attack upon a judgment based on intrinsic fraud is not allowed because the
fraudulent conduct may be properly exposed and rectified within the context of the
underlying adversarial process itself. In contrast, a collateral attack on a judgment
on the basis of extrinsic fraud is allowed because such fraud distorts the judicial
process to such an extent that confidence in the ability to discover the fraudulent
conduct through the regular adversarial process is undermined.



Id. (quoting Montgomery, 669 S.W.2d at 313-14). Finding that the alleged misrepresentation of the
value of National Gypsum was a material issue presented to and considered by the bankruptcy court
in rendering its order confirming the plan of reorganization, the supreme court held that the alleged
fraudulent conduct at issue in the state court lawsuit was intrinsic to the bankruptcy court
confirmation order. See id. at 349. The alleged fraudulent conduct was intrinsic to the bankruptcy
court order even in the face of the allegation that the defendants had misled the bankruptcy court. 
The essential point in this analysis is if the conduct at issue in the current suit was at issue or could
have been at issue in the previous suit, the claims are intrinsic to the prior judgment. Any attempt
to relitigate the claims in a new lawsuit, even if based on new information, constitutes a collateral
attack on the prior judgment. 

 In this case, Henderson is pursuing causes of action based on factual allegations that
the Defendants fraudulently recharacterized her community interest in certain marital property as the
separate property of Timothy Chambers. Henderson made the same claims with respect to the same
property in the 1997-98 divorce case. The record reflects that the alleged fraudulent conduct at issue
in this case was known and at issue in the divorce proceeding. The Original Petition for Divorce
filed by Henderson in 1997 expressly alleged fraud by Timothy Chambers with respect to
Henderson's community property rights. More specifically, Henderson alleged that Timothy
Chambers had accumulated property during the marriage and arranged through fraudulent
documentation for that property to appear to be Timothy Chambers's separate property when, in fact,
it was community property. The divorce petition specifically named Moore's Crossing Joint Venture
and BC Partnership as entities used by Timothy Chambers to defraud Henderson of her interest in
community property and alleged that "an actual or constructive fraud has been performed on
[Henderson] by the actions of [Timothy Chambers] (alone or in conjunction and conspiracy with the
other persons) and requests that the Court impose a constructive trust on the partnerships and declare
the ownership of the partnerships to be partially lodged in the community estate." 

 Henderson also gave the following testimony in her deposition in the divorce case:


Q: In Roman Numeral Paragraph VII of your original petition in this divorce action,
you plead that "Petitioner says that property has been accumulated perhaps in
the name of respondent or under documents that purport to create separate
property of the respondent." What property are you talking about?


A: Obviously, Moore's Crossing, BC Partnership, that whole ordeal.


Q: What attempted fraud are you asserting?


A: [Timothy Chambers] and his dad, their conspired effort. I guess his mother, too,
because the so-called declaration of gift includes his mother and I found out later
that she knew about it, so--


Q: And you see a fraud in that Dad couldn't give this to Tim?


A: No, I see a fraud in that originally it was our community property and our
retirement plan and two years later, when the money came, then it became
secretly his separate property.


Q: What was originally yours?


A: My community interest in the BC Partnership interest.



When asked in written interrogatories in the divorce case to explain how Timothy Chambers
committed fraud on her community property rights, Henderson answered that Timothy Chambers
had "conspired with his parents to take my share of the community interest in Moore's Crossing
Joint Venture." The record also contains a letter dated October 16, 1997 (written four days before
the original divorce petition was filed) from Henderson to Timothy Chambers's mother, Rosalie, in
which Henderson stated "[Timothy Chambers and William Chambers] have paid very good lawyers
to obliterate my community interest in Moore's Crossing." 

 Based on this record, we are persuaded that the conduct Henderson complains of in
this case was known at the time of the 1997-98 divorce action, was actually litigated as part of the
divorce action, was expressly part of the mediated settlement agreement between Henderson and
Timothy Chambers in that action, and was adjudicated as part of the agreed decree of divorce. Thus,
we find that the claims of fraudulent conduct at issue in this lawsuit were intrinsic to the 1997-98
divorce action and are barred as an impermissible collateral attack on the divorce decree.

 Henderson argues that the fact that she did not sue the Defendant Attorneys in the
divorce action distinguishes her claims against the attorneys from the rule articulated in Prostok. 
However, the question of whether allegations of fraud are intrinsic or extrinsic to a prior judgment
does not hinge exclusively on who the parties were to the prior judgment. It is a question of whether
the conduct being complained of was known or could have been known, or was at issue or
potentially at issue in the prior lawsuit. See Prostok, 165 S.W.3d at 347-48. This is consistent with
the "transactional approach" to claim preclusion adopted by the Texas Supreme Court in Barr v.
Resolution Trust Corp., 837 S.W.2d 627 (Tex. 1992). In Barr, the supreme court held "[a]
subsequent suit will be barred if it arises out of the same subject matter of a previous suit and which
through the exercise of due diligence, could have been litigated in a prior suit." Barr, 837 S.W.2d
at 630. The supreme court has also recognized that the principle of claim preclusion adopted in Barr
applies to tort claims litigated as part of a divorce proceeding. Twyman v. Twyman, 855 S.W.2d 619,
624-25 (Tex. 1993). 

 Henderson knew of, complained about, and placed in issue her allegations relating
to the possible fraudulent recharacterization of her community property interest in BC
Partnership/Moore's Crossing while litigating with Timothy Chambers in their divorce. Henderson
alleged in the divorce action that Timothy Chambers acted in a civil conspiracy with others to
defraud her of her community interest in the partnerships. She was aware of the alleged fraudulent
conduct. She was also aware of a potential claim that the alleged fraud was the product of a
conspiracy of actors in addition to her ex-husband. She specifically asserted in writing that the fraud
was accomplished with the assistance of her ex-husband's lawyers. Consequently, the judgment in
the divorce proceeding stands as a bar to any claims by Henderson that are based on the same facts
as those at issue in the divorce proceeding, including the claims against the Defendant Attorneys in
question here. Barr, 837 S.W.2d at 630.


Conclusion

 We conclude that the issue of whether Henderson's community property interest in
the partnerships in question in this lawsuit had been fraudulently recharacterized as her ex-husband's
separate property was known and actually litigated during the 1997-98 divorce proceeding between
Henderson and her ex-husband Timothy Chambers. We hold that the claims of fraudulent conduct
by Timothy Chambers, William Chambers, and Defendant Attorneys in this lawsuit were, therefore,
intrinsic to the divorce action. Consequently, Henderson's claims in this case constitute an
impermissible collateral attack on the 1998 agreed divorce decree. We affirm the judgment of the
trial court. 


 

 G. Alan Waldrop, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed: March 31, 2006
1. Summary judgment was also granted in favor of defendant William Gurasich, but this
Court granted Henderson's motion to voluntarily dismiss her appeal as it pertains to the judgment
favoring Gurasich on April 29, 2005.

2. These entities were all affiliated with BC Partnership's joint venture known as Moore's
Crossing. 
3. The bond and trade unsecured creditors committee appointed by the bankruptcy trustee
represented the interests of the junior bondholders, including those that filed the subsequent state
court lawsuit, with respect to the fraud claims in the bankruptcy proceeding.